STATE OF NEW HAMPSHIRE

MERRIMACK, ss.                                                    SUPERIOR COURT

|  |  |
|---|---|
| LEGACY GLOBAL SPORTS, L.P., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **SECOND AMENDED COMPLAINT** |
| | ) |
| JOHN ST. PIERRE, TRAVIS BEZIO, and | ) Docket No. 218-2019-CV-00198 |
| NORTH ATLANTIC HOCKEY LLC d/b/a/ | ) |
| THE RINKS AT EXETER, | ) |
| | ) |
| Defendants. | ) |
| | ) |

        Plaintiff Legacy Global Sports, L.P. ("Legacy Global"), hereby sues Defendants John St.

Pierre, Travis Bezio, and North Atlantic Hockey LLC d/b/a The Rinks at Exeter ("Rinks at

Exeter"), and alleges as follows:

## PRELIMINARY STATEMENT

        1.        Defendants John St. Pierre and Travis Bezio are, respectively, the former

President and CEO, and former Director of Global Tours and New England Regional Hockey

Tours (and previously an officer as the Vice President of Finance) of Legacy Global, who

conspired together with co-defendant Rinks at Exeter, non-party JSP SS TB Exeter Ice Hockey

Group LLC d/b/a Seacoast Spartans NAHG ("Seacoast Spartans"), and others, to betray Legacy

Global, usurping corporate opportunities and wasting corporate resources for their own benefit

and the benefit of co-defendant Rinks at Exeter, in which St. Pierre and Bezio each holds

approximately a 25% interest. In efforts to hide their disloyalty and the damage that it has

caused, St. Pierre changed Legacy Global's monthly accounting reports before he presented them

to the board, without letting the accounting department know he was making changes. He also

changed transaction documents, after receiving them from outside counsel and without notifying outside counsel of the changes, to convince the accounting department improperly to recognize at least $250,000 in pre-transaction revenue. St. Pierre has also falsely informed the accounting department that an agreement had been reached with a third party to refund approximately $700,000 in expenses when in fact no such agreement had been reached. These and other accounting irregularities that St. Pierre created caused inaccuracies in the millions of dollars. Near the time of or since St. Pierre's departure from Legacy Global, Bezio engaged in mass deletions of emails in further efforts to conceal their wrongdoing.

2.      St. Pierre and Bezio have diverted opportunities and profits from Legacy Global to Defendant Rinks at Exeter. Among other things, St. Pierre and Bezio launched a competitive online academy program at Rinks at Exeter and then utilized resources of Legacy Global to generate interest in an international project for an enhanced academy program with a dormitory at Rinks at Exeter. When breaching their fiduciary and contractual duties to Legacy Global, St. Pierre and Bezio acted in the interests and on behalf of their co-defendant, Rinks at Exeter. Moreover, as described in more detail below, as recently as June 2018, Defendants St. Pierre and Bezio plotted in an online chat with each other to enrich Defendant Rinks of Exeter for their own benefit, while planning to squeeze out each of their other partners in Rinks at Exeter before those partners learned about a potential profitable transaction.

3.      In addition, defendant Rinks at Exeter has tortiously interfered with Legacy Global's various contractual relationships between Legacy Global and defendants St. Pierre and Bezio.

4.      Defendants must not be allowed to move ahead with developing competitive activities, are liable to Legacy Global for damages and should be deemed to hold the fruits of

their wrongdoing in a constructive trust for Legacy Global, as well as to pay damages to make Legacy Global whole.

## PARTIES

5.      Plaintiff Legacy Global is a Delaware limited partnership with its principal place of business located at 290 Heritage Avenue, Portsmouth, New Hampshire.

6.      Defendant John St. Pierre is an individual with an address at 3 Bradley Lane, North Hampton, New Hampshire.

7.      Defendant Travis Bezio is an individual with an address at 6 Winterberry Lane, North Hampton, New Hampshire.

8.      Defendant Rinks at Exeter is a New Hampshire limited liability company with its principal place of business located at 40 Industrial Drive, Exeter, New Hampshire. The registered agent for the Rinks at Exeter is Skipp Schultz, 42 Ross Rd., Durham, New Hampshire.

## JURISDICTION AND VENUE

9.      Jurisdiction is properly conferred by RSA 491:7 and RSA 498:1.

10.     Venue is proper in Rockingham County, as that is where plaintiff and at least one of the defendants resides and/or has its principal place of business. *See* RSA 507:9.

## FACTUAL BACKGROUND

### Legacy Global and its International and Academy Activities

11.     Among other products and services, Legacy Global engages over 1,000,000 elite youth athletes and their families at over 350 exclusive youth sports events, tournaments and tours across North America and Europe each year.

12.     Since its inception about 15 years ago, Legacy Global has grown to a multi-national organization, with approximately 500 employees world-wide.

13.     Approximately seven years ago, Legacy Global formed a venture with South Kent School in Connecticut, together launching "South Kent Selects Academy" ("SKSA"), an elite ice hockey program developed on the foundation of Legacy Global's hockey programming and South Kent's world-class schooling and facilities. In seven years, SKSA developed an internationally recognized and top 10 nationally ranked hockey program at the U15, U16 and U18 age levels culminating in the U18 team winning the 2018 USA Hockey National Tier 1 Championship.

### *St. Pierre's At-Will Employment with Legacy Global*

14.     Defendant John St. Pierre was a co-founder of Legacy Global.

15.     At relevant times through November 30, 2018, St. Pierre was employed by Legacy Global as its President and chief executive officer. St. Pierre's responsibilities and duties included providing direct oversight and leadership with respect to Legacy Global's operations, finances, budgeting, and business growth, among other things.

16.     As St. Pierre has acknowledged in writing, his employment with Legacy Global was at-will, meaning either St. Pierre or Legacy Global could terminate the employment relationship at any time, for any reason, with or without cause or notice. St. Pierre served at the pleasure of Legacy Global's board of managers.

17.     As its President and CEO, St. Pierre owed fiduciary duties to Legacy Global, including but not limited to the duty of undivided loyalty. St. Pierre has expressly acknowledged in writing that he understood financial integrity was a "must" expected of him at Legacy Global.

### *Bezio's At-Will Employment with Legacy Global*

18.     Defendant Travis Bezio has been employed with Legacy Global since 2010 and has held various positions as a member of Legacy Global's leadership team, including as a

Director of Events Management, Vice President of Finance, and most recently as the Global

Tour Director and New England Regional Hockey Tour Director.

19.    Prior to becoming an employee, Bezio had provided certain consulting services to

Legacy Global's predecessors, including management, accounting and tax services.

20.    At relevant times, Bezio's duties as the Global Tour Director and New England

Regional Hockey Tour Director at Legacy Global included, among other things, the development

of acquisition areas of interest for Legacy Global (including event housing and soccer tour

companies), development of acquisition models and executing acquisitions, providing cash flow

and financial projections & budgeting, events management including Europe integration, and

integration of Legacy Global's tournament and tour interface platforms.

21.    As a senior member of Legacy Global's leadership team and while Vice President

of Finance, Bezio owed fiduciary duties to Legacy Global. As an employee generally, he also

owed to Legacy Global a duty of loyalty. Bezio has expressly acknowledged in writing that he

understood financial integrity and stability was a "must" expected of him.

22.    As part of his employment, in or about 2015, Bezio entered into a Confidentiality

and Nondisclosure Agreement with Legacy Global, which is incorporated by reference herein.

23.    In the Confidentiality and Nondisclosure Agreement, Bezio agreed, among other

things, to hold and maintain confidential information belonging to Legacy Global in strictest

confidence for the sole and exclusive benefit of Legacy Global and not to use such confidential

information for Bezio's own benefit or for the benefit of other parties.

***St. Pierre's and Bezio's Class C Unit Grant Agreements***

24.    On or about April 30, 2018, St. Pierre and Legacy Global entered into a letter

agreement for a Grant of Class C Units of Legacy Global Sports, L.P. to St. Pierre (the "St.

Pierre Grant Agreement"), which is incorporated by reference herein.

25.     Under the Grant Agreement, St. Pierre received a grant of 50,000 Class C ownership units in Legacy Sports, subject to certain vesting conditions.

26.     On or about October 1, 2018, Bezio and Legacy Global entered into a letter agreement for a Grant of Class C Units of Legacy Global Sports, L.P. to Bezio (the "Bezio Grant Agreement"), which is incorporated by reference herein.

27.     Under the Bezio Grant Agreement, Bezio received a grant of 88,306 Class C ownership units in Legacy Sports, subject to certain vesting conditions.

28.     In paragraph 7(a) of their respective Grant Agreements, St. Pierre and Bezio each acknowledged that by virtue of his employment with Legacy Global, he had access to confidential and proprietary information belonging to Legacy Global and its direct or indirect subsidiaries (the "Legacy Companies"), including without limitation confidential and proprietary information concerning the past, current and/or future business activities and operations of the Legacy Companies, computer programs, unpatented inventions, designs, discoveries or improvements, trading models, algorithms, trade secrets, intellectual property, marketing, research and development or business plans, revenue, forecasts, generally confidential personnel information, pricing, costing and financial information, current and prospective customer and supplier lists and information on customers, suppliers or their respective employees, and information concerning planned or pending acquisitions or divestitures ("Legacy Confidential Information").

29.     In paragraph 7(b) of their respective Grant Agreements, St. Pierre and Bezio each agreed that all Legacy Confidential Information is and would remain the sole property of the Legacy Companies and that he would not use any of the Legacy Confidential Information for his

personal benefit and would not disclose any Legacy Confidential Information during and after his employment with the Legacy Companies, other than to specifically authorized persons.

30.    In paragraph 7(c) of their respective Grant Agreements, St. Pierre and Bezio each agreed that upon the termination of his employment with the Legacy Companies for any reason or no reason, he would promptly return to the Legacy Companies all tangible items, including computer files, electronic media and data, containing, based upon or relating in any way to the Legacy Confidential Information, and any other items in each of St. Pierre's and Bezio's possession that are the property of the Legacy Companies.

31.    In paragraph 9 of their respective Grant Agreements, St. Pierre and Bezio each agreed that during his employment with any of the Legacy Companies and for two (2) years after the termination of his employment, regardless of the reason for the termination, that each of St. Pierre and Bezio would not engage in certain "Competitive Activity" as defined in the Grant Agreement.

32.    In their respective Grant Agreements, Competitive Activity was defined, in substance, as direct or indirect involvement, including as an owner, principal employee, officer or director, in any business that was identical or similar to the business in which the Legacy Companies were engaged in the United States and world-wide, immediately prior to the end of employment.

33.    In addition, St. Pierre and Bezio each agreed, that during his employment with the Legacy Companies and for two (2) years after the termination of his employment, that he would not directly or indirectly solicit, recruit or induce to provide services elsewhere any Legacy Companies' employees, and would not interfere with the Legacy Companies' relationships with any of their customers or prospective customers.

7

34.    In paragraph 11 of their respective Grant Agreements, St. Pierre and Bezio each also acknowledged and agreed, in substance, that the non-compete and non-solicitation restrictions therein were reasonable and would not unreasonably preclude or limit St. Pierre's and Bezio's ability to earn a livelihood; that these restrictions were necessary to protect the goodwill and legitimate business interests of the Legacy Companies; that the business of the Legacy Companies is worldwide in scope; that the potential harm to the Legacy Companies of the non-enforcement of the non-compete and non-solicitation provisions outweighs any potential harm to St. Pierre or Bezio; that in the event of any breach or any threatened breach by St. Pierre or Bezio of any of the non-solicitation provisions, the Legacy Companies would suffer irreparable harm because monetary damages will be inadequate to compensate the Legacy Companies for any breach or threatened breach of any of such sections, and in addition and supplementary to other rights and remedies existing in its favor, the Legacy Companies are entitled to specific performance and/or injunctive or other equitable relief from a court of competent jurisdiction in order to enforce or prevent any violations of any of the provisions of such sections (without posting a bond or other security).

35.    St. Pierre and Bezio each also agreed that in the event of a breach or violation by St. Pierre or Bezio of any of the provisions of the non-compete set forth in Section 9 of the Grant Agreement, in addition to all other available legal and equitable rights and remedies, the two (2) year non-compete period would automatically be extended by the amount of time between the initial occurrence of the breach or violation and when such breach or violation has been duly cured.

36.    St. Pierre and Bezio each also expressly agreed that:

THE LEGACY COMPANIES MAY APPLY TO A COURT OF COMPETENT JURISDICTION EX PARTE TO ENFORCE OR EFFECTUATE SUCH RIGHTS TO

SPECIFIC PERFORMANCE AND/OR INJUNCTIVE OR OTHER EQUITABLE RELIEF, AND HEREBY EXPRESSLY WAIVE RIGHTS TO ADVANCE NOTICE REGARDING THE SAME

37.    The St. Pierre Grant Agreement and the Bezio Grant Agreement are governed by Delaware Law.

***The Limited Partnership Agreement***

38.    As part of the grant of ownership interest in Legacy Global pursuant to their respective Grant Agreements, St. Pierre and Bezio were each required to and did become a party to Legacy Global Third Amended and Restated Limited Partnership Agreement of the Company (the "LP Agreement"), dated as of April 30, 2018, which is incorporated by reference herein.

39.    Under Section 5.8(b)(ii) of the LP Agreement, St. Pierre had the exclusive right from time to time to designate one member of the board of managers of Legacy Global for so long as St. Pierre had not materially breached any obligation to Legacy Global (whether under the LP Agreement or under any employment agreement or restrictive covenant agreement in effect from time to time).

40.    St. Pierre had originally designated himself as his appointee to the board of managers of Legacy Global.

41.    Pursuant to section 6.5 of the LP Agreement, St. Pierre and Bezio, as Class C Unitholders, were obligated to present to Legacy Global all investment or business opportunities of which each of them became aware and which would be within the scope and investment objectives related to the business of the Legacy Companies, beneficial to the business of the Legacy Companies, or would otherwise be competitive with the business of the Legacy Companies.

***St. Pierre's and Bezio's Diversion of Opportunities Belonging to Legacy Global***

42.    Upon information and belief, since Legacy Global took on a substantial outside investor in or about 2016, St. Pierre and Bezio have in concert used their respective leadership positions with Legacy Global (including through the use of Legacy Global's goodwill and resources) to advance their own interests in a competitive venture, have usurped corporate opportunities that rightfully belong to Legacy Global, and have committed corporate waste, and accounting mismanagement, as well as mass deletions of emails in order to conceal their misconduct from Legacy Global's board of managers and to perpetuate their ability to advance their own interests to the detriment of Legacy Global.

43.    While they were employed as members of Legacy Global's leadership team, St. Pierre and Bezio had each acquired approximately a 25% ownership interest in the Seacoast Spartans hockey club and co-defendant Rinks at Exeter.

44.    St. Pierre and Bezio worked together to improperly use their positions with Legacy Global to cause Legacy Global to provide certain services to the Seacoast Spartans without formal agreements in place, including the use of the Legacy Global registration system for the Spartans' players and families, use of Legacy Global administrative support staff, Spartans' players participating in Legacy Global tours and tournaments, access to scholarships through the affiliated Sports4Life Foundation, access to Bauer apparel and equipment and the use of Legacy Global branding on the Spartan's website.

45.    The Rinks at Exeter has taken advantage of St. Pierre's and Bezio's disloyalty and has not only benefited from their actions, but has engaged in independent wrongful acts in concert with the Seacoast Spartans designed to interfere with Legacy Global's contractual relationship with its executives, including, in part, through the unauthorized use of intellectual

property belonging to Legacy Global.

46.    Upon information and belief, in about 2016, St. Pierre and Bezio took steps to expand the scope of their business activities and launched the Seacoast Spartans Academy (the "Spartans Academy"), an online student athlete educational program at Rinks at Exeter.

47.    Bezio disclosed to St. Pierre all of Bezio's activities pertaining to the Spartans Academy and obtained St. Pierre's approval of those activities.

48.    As St. Pierre and Bezio knew, the educational services provided by the Spartans Academy related to business of Legacy Global, such as the existing SKSA program. The Spartans Academy could have been beneficial to the business of Legacy Global. Instead, the Spartans Academy competed with Legacy Global. Indeed, the vendor for the online educational curriculum used by the Spartans Academy, US Performance Academy, is a vendor with which a subsidiary of Legacy Global, known as Global Premier Soccer, gives players access to an online education platform at the Global Premier Soccer International Academy in Valencia, Spain. Yet in or about July 2018, with a glaring conflict of interest, St. Pierre and Bezio communicated about getting preferential pricing for the Rinks at Exeter and the Seacoast Spartans from the US Performance Academy based on Bezio referring Global Premier Soccer business to the US Performance Academy.

49.    Upon information and belief, at relevant times, Bezio used his position at Legacy Global in pursuing efforts to expand the Spartans Academy, including to provide immersion language classes to non-English speaking student athletes.

50.    Upon information and belief, at relevant times, Bezio used his position with Legacy Global to enrich himself and the Rinks at Exeter, at the expense of Legacy Global. Bezio's misconduct has included wasting resources such as converting the service of Legacy

Global's employees who reported to him and the goodwill and relationships developed by Legacy Global, to compete with Legacy Global. Bezio did so when, among other things, promoting and marketing the Spartans Academy and Rinks at Exeter to Legacy Global's customers, including families and student athletes.

51.     In December 2017, while a Legacy Global employee and member of its leadership team, Bezio was expressly promoting the Seacoast Academy with a goal that by 2018-2019 "people will know us on the national stage just like what I did at Selects Academy at South Kent!" for Legacy Global.

52.     Bezio disclosed to St. Pierre his efforts to promote the Spartans Academy to Legacy Global's customers and obtained St. Pierre's approval of those activities.

53.     Upon information and belief, Bezio used his position with Legacy Global to develop an additional venture known as the Vermont Hockey Training Academy, which was also related to the business of Legacy Global.

54.     The business of Defendant Rinks at Exeter, in which St. Pierre and Bezio each have held approximately a 25% interest, had historically been limited to renting ice time and hosting certain local leagues and tournaments.

55.     Since in or about 2016, however, St. Pierre and Bezio used their time as senior members of the leadership team of Legacy Global, to work largely on expanding the business of Defendant Rinks at Exeter into areas that are directly competitive to the business of the Legacy Companies, including hosting national hockey tournaments, camps, clinics, academy programs and international projects.

56.    For example, just recently, Rinks at Exeter, Seacoast Spartans, and Seacoast Academy hosted a showcase tournament with college coaches and professional scouts that competes improperly with the business of Legacy Global.

57.    In pursuing these opportunities on behalf of Defendant Rinks at Exeter, St. Pierre and Bezio not only utilized the time and resources that each of them should have been dedicating to their work as the President and CEO and the Global Tour and New England Hockey Tour Director of Legacy Global, but each of them has used the Legacy Global name, goodwill, intellectual property and manpower to benefit that outside venture in a way that created a false impression that Legacy Global had direct involvement in the venture.

***Planned Expansion of Rinks at Exeter***

58.    Since in or about 2016, while St. Pierre was still employed as the President and CEO of Legacy Global, St. Pierre and Bezio were actively working on developing expansion and feasibility plans for Defendant Rinks at Exeter, including the launch of an online learning academy, the development of a dormitory for a youth hockey academy, and a partnership with Laxachusetts to build lacrosse fields and to develop a residential lacrosse academy.

59.    By in or about April 2016, Bezio and St. Pierre had developed "Master Plans" for the Rinks at Exeter that included dormitories and shared those by email with, among others, government officials. These plans followed Bezio communicating with St. Pierre and others about turning the Defendant Rinks at Exeter into a "more robust overall sport club like LEGACY is working on."

60.    In or about February 2017, without knowing the full extent of it, another member of the board of managers of Legacy Global warned St. Pierre that the work he did on an academy program at Rinks at Exeter posed a conflict of interest. That board member reminded St. Pierre

about SKSA and the beneficial aspects of academy programs for Legacy Global. St. Pierre

intentionally and improperly disregarded the warning.

61.    Even after that warning, St. Pierre and Bezio moved ahead serving Defendant

Rinks at Exeter and the Seacoast Spartans at the expense of Legacy Global. For example, in or

about August 2017, St. Pierre caused an employee of Legacy to design a brochure for the

Seacoast Performance Academy, thereby utilizing Legacy Global resources for the benefit of the

Rinks at Exeter.

62.    Bezio disclosed to St. Pierre his efforts to promote the Spartans Academy to

Legacy Global's customers and obtained St. Pierre's approval of those activities.

***St. Pierre and Bezio Work to Enrich Rinks at Exeter and Themselves at Exclusion of Others***

63.    Indeed, in a June 2018 online chat, Bezio wrote to St. Pierre that "China group

getting very serious about buying our building … I think this could be a goldmine … we get a

giant management contract to manage the facility including the whole thing we wanted still own

the academy etc…."

64.    St. Pierre responded that, among other things, "[w]e should take Atul out." Bezio

responded that while the idea was "interesting" that "maybe a bit shady given our insider…. and

Corey would feel really f[*]cked." In response, St. Pierre explained that:

> Reality is if we do that with these guys Corey is out
> No room or need for him
> Or Skipp
> Or Atul

Bezio replied: "agreed."

65.    By in or about July 2018, other management confronted St. Pierre about related-

party transactions. In response, St. Pierre submitted to the board an inadequate and misleading

disclosure of his and Bezio's conflicts of interest. With respect to the academy programs and

plans at Rinks at Exeter, St. Pierre informed the board of managers of Legacy Global in substance that it was a limited program in beta involving Bezio's son's team taking online high school courses while playing hockey for the Spartans team. St. Pierre omitted from his disclosure, among other things, the substantial plans for a dormitory, the substantial time he devoted to the project on an ongoing basis, and the resources of Legacy Global that had been wasted for the benefit of the Rinks at Exeter.

66.    Upon information and belief, by in or about August 2018, as part of their work on the Rinks at Exeter expansion project, St. Pierre and Bezio had solicited and obtained letters, promotional proposals and other supporting materials from State of New Hampshire and Town of Exeter government officials, specifically designed to encourage a group of foreign investors from China to invest and participate in an international expansion the Rinks at Exeter in academy offerings.

67.    In fact, the expansion project for Defendant Rinks at Exeter has been promoted by St. Pierre, Bezio and others as part of a "mega sports, housing, hotel project," slated to include the development of indoor and outdoor fields, a sports academy and a dormitory, among other things.

68.    In pursuing the expansion opportunity for Defendant Rinks at Exeter, St. Pierre and Bezio used the resources and goodwill belonging to Legacy Global, including using Legacy Global's employees, using their Legacy Global email addresses and, upon information and belief, holding themselves out as Legacy Global employees, while pursuing their own personal interests and those of Rinks at Exeter.

69.    While pursuing the expansion opportunity at Rinks at Exeter, St. Pierre and Bezio not only used the Legacy Global name throughout the presentation materials, but also devoted

significant time and efforts to their competitive activities, all of which should have been devoted to Legacy Global matters.

70.     Bezio disclosed to St. Pierre all of his efforts pertaining to the Rinks at Exeter expansion efforts and obtained St. Pierre's approval of such activities.

71.     St. Pierre's and Bezio's efforts pertaining to the expansion and development project for Defendant Rinks at Exeter constituted a direct breach of their respective obligations under their respective Grant Agreements and the LP agreement, and usurpation of corporate opportunities belonging to Legacy Global, in breach of their fiduciary duties.

72.     In addition, while serving as members of Legacy Global's leadership team, St. Pierre and Bezio misused their positions with Legacy Global to seek favorable financing arrangements for the Rinks at Exeter in violation of their fiduciary duties. Likewise, without disclosing their disloyal and competitive conduct, they have arranged for advances from Legacy Global to themselves in the hundreds of thousands of dollars that did not in fact serve Legacy Global's interests.

### Termination of St. Pierre's Board Rights for Cause

73.     Upon discovering at least a portion of St. Pierre's competitive activities described above, evidenced by a Written Consent of the Board of Managers dated November 28, 2018, the board of managers of Legacy Global determined that St. Pierre had materially breached certain obligations to Legacy Global, including but not limited to the obligation not to engage in a competitive activity prohibited under the Grant Agreement, and resolved that St. Pierre would no longer have the right to designate a member of the board of managers of Legacy Global in

accordance with Section 5.8(b)(ii) of the LP Agreement. Accordingly, as of November 28, 2018, St. Pierre was removed for cause from the board of managers of Legacy Global.

***Termination of St. Pierre's At-will Employment and Bezio's Resignation***

74.    On November 28, 2018, the Legacy Global board voted unanimously to remove without cause all officers of Legacy Global, including St. Pierre. At the time, St. Pierre served as an officer and employee in an at-will capacity. The board of managers unanimously appointed, among others, a new president and CEO.

***Resignation by Bezio***

75.    On March 15, 2019, Bezio resigned from his employment with Legacy Global.

***St. Pierre's and Bezio's Concealment and Perpetuation of their Wrongdoing***

76.    Legacy Global's post-termination investigation of St. Pierre has uncovered that since at least early 2017, St. Pierre, with Bezio's assistance, engaged in multiple instances of corporate misconduct designed to conceal his activities and to inflate artificially the perception of Legacy Global's performance levels. By so doing, St. Pierre delayed detection of his competitive activities and the harm they have caused, thereby perpetuating his diversion of corporate opportunities to Defendant Rinks at Exeter.

77.    Among other things, at about the time of and/or since St. Pierre's termination, Bezio, while remaining a Legacy Global employee, engaged in purposeful mass-deletions of his emails at Legacy Global that Bezio believed could be perceived to reflect misconduct on the part of St. Pierre and him.

78.    Also, during his tenure as CEO and President of Legacy Global, St. Pierre has been closely involved in the company's accounting matters, providing himself with access to the company's accounting systems and holding himself out to Legacy Global accounting staff as

having an accounting degree and background, and being proficient in accounting concepts. On multiple occasions, St. Pierre made material changes to the Legacy Companies' monthly accounting reports, such as decreasing operating expenses, before presenting them to the board of managers of Legacy Global, without informing the accounting department.

79.     In another example, St. Pierre caused the accounting department to book a $700,000 journal entry for an expense reimbursement transaction that he represented had reached the point of a contractual right. After auditors became involved, the entry was reversed and, in fact, St. Pierre could never show genuine documentation that supported his representation.

80.     In another example of accounting misconduct, in or about November 2017, St. Pierre executed a purchase and sale transaction between one of the Legacy Companies and an entity known as Travel Team USA LLC ("TTUSA") to purchase the assets of TTUSA. At the closing, St. Pierre falsely modified the transaction terms, without notice to the board of managers or approval by it, in order to pressure the accounting department to improperly recognize pre-transaction revenues and profit of at least $250,000.

81.     Upon information and belief, St. Pierre engaged in these and other instances of accounting malfeasance as part of efforts to conceal his misconduct and to prolong his ability to misuse Legacy Global's assets for his own purposes. St. Pierre exerted improper influence over the accounting functions at Legacy Global so he could artificially inflate Legacy Global's actual and forecasted EBITDA, helping conceal from the board of managers of Legacy Global his disloyal activities and diversion of corporate opportunities belonging to Legacy Global, as described above.

82.     St. Pierre has failed to return to Legacy Global property belonging to Legacy Global that he is believed to still possess, including but not limited to substantial volumes of

electronic files.

83.    Upon information and belief, documents belonging to Legacy Global have been accessed, modified, and deleted by a Google user in the name of St. Pierre's spouse in an effort to hide certain materials from Legacy Global as recently as in June and July 2019, during the pendency of this litigation.

## COUNT ONE
### (Breach of Fiduciary Duty – St. Pierre and Rinks at Exeter)

84.    Plaintiff restates and incorporates by reference herein the allegations set forth above.

85.    As an executive officer of Legacy Global, St. Pierre owed Legacy Global fiduciary duties, including the duty of undivided loyalty.

86.    By the conduct described above, including but not limited to by launching academy programs at Defendant Rinks at Exeter, pursuing international programs and the expansion opportunity of a dormitory that should have been presented to and pursued at Legacy Global, by using Legacy Global goodwill and resources in doing so, and by devoting significant time and efforts to his competitive activities that should have been devoted to Legacy Global matters, St. Pierre has breached his fiduciary duties to Legacy Global.

87.    By his breach of fiduciary duties, St. Pierre directly and proximately caused Legacy Global to suffer substantial damages within jurisdictional limits of this Court in an amount to be proven at trial.

88.    Because St. Pierre breached his fiduciary duties for the benefit of Defendant Rinks at Exeter and as its authorized agent, Defendant Rinks at Exeter is jointly and severally liable with St. Pierre for his breaches, including but not limited to, for profits that were enjoyed or projected by the Rinks.

89.     In addition, the Rinks at Exeter knowingly and intentionally aided and abetted such breaches of fiduciary duty by St. Pierre, and substantially assisted him and benefitted from such breaches, making the Defendant Rinks at Exeter jointly and severally liable with St. Pierre for his breaches.

## COUNT TWO
### (Faithless Servant – St. Pierre)

90.     Plaintiff restates and incorporates by reference herein the allegations set forth above.

91.     As an executive officer of Legacy Global, St. Pierre owed Legacy Global fiduciary duties, including the duty of undivided loyalty.

92.     By the conduct described above, including, but not limited to, by pursuing competitive activities for the benefit of Defendant Rinks at Exeter, by using Legacy Global goodwill and resources in doing so, and by devoting significant time and efforts to his competitive activities that should have been devoted to Legacy Global matters, St. Pierre has acted as a faithless servant to Legacy Global.

93.     As a result of St. Pierre's breach of fiduciary duties as a faithless servant, Legacy Global is entitled to recover from St. Pierre all unjust compensation, within jurisdictional limits of this Court, that it paid to St. Pierre since the time period of his first disloyal act.

## COUNT THREE
### (Breach of Contract – St. Pierre Grant Agreement)

94.     Plaintiff restates and incorporates by reference herein the allegations set forth above.

95.     The Grant Agreement constitutes a binding and enforceable contract between the parties.

96.     In paragraph 9 of the Grant Agreement, St. Pierre agreed that during his employment with any of the Legacy Companies and for two (2) years after the termination of his employment, regardless of the reason for the termination, that St. Pierre would not engage in certain Competitive Activity as defined in the Grant Agreement.

97.     Legacy Global has performed all of its obligations under the Grant Agreement.

98.     All conditions precedent to St. Pierre's performance of his obligations under the Grant Agreement have been satisfied or excused.

99.     By engaging in the conduct described above, during his employment at Legacy Global and within two years after the termination of his employment, including by pursuing competitive business activities as an owner and interest holder of Rinks at Exeter, St. Pierre has breached the Grant Agreement.

100.     As a result of St. Pierre's breach of the Grant Agreement, St. Pierre has directly and proximately caused Legacy Global to suffer foreseeable and substantial damages within jurisdictional limits of this Court in an amount to be proved at trial.

## COUNT FOUR
### (Breach of LP Agreement – St. Pierre)

101.     Plaintiff restates and incorporates by reference herein the allegations set forth above.

102.     St. Pierre and Legacy Global are parties to the LP Agreement.

103.     Pursuant to section 6.5 of the LP Agreement, St. Pierre as a Class C Unitholder was obligated to present to Legacy Global all investment or business opportunities of which he became aware and which would be within the scope and investment objectives related to the business of the Legacy Companies, beneficial to the business of the Legacy Companies, or would otherwise be competitive with the business of the Legacy Companies.

104.    By his conduct described above, including but not limited to by failing to present to Legacy Global the Rinks at Exeter expansion opportunity and instead by misappropriating for himself that opportunity, St. Pierre has breached the LP Agreement.

105.    As a result of his breach of the LP Agreement, St. Pierre has directly and proximately caused Legacy Global to suffer foreseeable and substantial damages within jurisdictional limits of this Court.

## COUNT FIVE
(Good Faith and Fair Dealing – St. Pierre)

106.    Plaintiff restates and incorporates by reference herein the allegations set forth above.

107.    St. Pierre and Legacy Global are parties to the LP Agreement.

108.    Embodied within the LP Agreement is an implied and express covenant of good faith and fair dealing that St. Pierre will act in good faith and fairly with Legacy Global.

109.    By his conduct described above, including but not limited to by failing to present to Legacy Global the Rinks at Exeter expansion opportunity and instead by misappropriating for himself that opportunity, St. Pierre has breached the covenant of good faith and fair dealing embodied in the LP Agreement.

110.    As a result of his breach of the covenant of good faith and fair dealing, St. Pierre has directly and proximately caused Legacy Global to suffer foreseeable and substantial damages within jurisdictional limits of this Court.

## COUNT SIX
(Breach of Duty of Loyalty – Bezio and Rinks at Exeter)

111.    Plaintiff restates and incorporates by reference herein the allegations set forth above.

112.    As a former CFO of Legacy Global and a senior member of the leadership team of Legacy Global, Bezio owed Legacy Global fiduciary duties and a duty of undivided loyalty.

113.    By the conduct described above, including but not limited to by launching academy programs at Defendant Rinks at Exeter, pursuing international programs and the expansion opportunity of a dormitory that should have been presented to and pursued at Legacy Global, by using Legacy Global goodwill and resources in doing so, and by devoting significant time and efforts to his competitive activities that should have been devoted to Legacy Global matters, Bezio has breached his fiduciary duties to Legacy Global.

114.    By his breach of fiduciary duties, Bezio directly and proximately caused Legacy Global to suffer substantial damages within jurisdictional limits of this Court in an amount to be proven at trial.

115.    Because Bezio breached his fiduciary duties for the benefit of Defendant Rinks at Exeter and as its authorized agent, the Defendant Rinks at Exeter is jointly and severally liable with Bezio for his breaches.

116.    In addition, Defendant Rinks at Exeter knowingly and intentionally aided and abetted such breaches of fiduciary duty by Bezio, and substantially assisted him and benefitted from such breaches, making the Defendant Rinks at Exeter jointly and severally liable with Bezio for his breaches, including but not limited to, for profits that were enjoyed or projected by the Rinks.

**COUNT SEVEN**
(Faithless Servant – Bezio)

117.    Plaintiff restates and incorporates by reference herein the allegations set forth above.

118.     As a senior member of the leadership team of Legacy Global, Bezio owed Legacy Global fiduciary duties, including the duty of undivided loyalty.

119.     By the conduct described above, including, but not limited to, by pursuing competitive activities for the benefit of Defendant Rinks at Exeter, by using Legacy Global goodwill and resources in doing so, and by devoting significant time and efforts to his competitive activities that should have been devoted to Legacy Global matters, Bezio has acted as a faithless servant to Legacy Global.

120.     As a result of Bezio's breach of fiduciary duties as a faithless servant, Legacy Global is entitled to recover from Bezio all unjust compensation, within jurisdictional limits of this Court, that it paid to Bezio since the time period of his first disloyal act.

## COUNT EIGHT
(Breach of Contract – Bezio Grant Agreement)

121.     Plaintiff restates and incorporates by reference herein the allegations set forth above.

122.     The Grant Agreement constitutes a binding and enforceable contract between the parties.

123.     In paragraph 9 of the Grant Agreement, Bezio agreed that during his employment with any of the Legacy Companies and for two (2) years after the termination of his employment, regardless of the reason for the termination, that Bezio would not engage in certain Competitive Activity as defined in the Grant Agreement.

124.     Legacy Global has performed all of its obligations under the Grant Agreement.

125.     All conditions precedent to Bezio's performance of his obligations under the Grant Agreement have been satisfied or excused.

126.    By engaging in the conduct described above, during his employment at Legacy Global, including by pursuing competitive business activities as an owner and interest holder of Rinks at Exeter, Bezio has breached the Grant Agreement.

127.    As a result of Bezio's breach of the Grant Agreement, Bezio has directly and proximately caused Legacy Global to suffer foreseeable and substantial damages within jurisdictional limits of this Court in an amount to be proved at trial.

**COUNT NINE**
(Breach of LP Agreement – Bezio)

128.    Plaintiff restates and incorporates by reference herein the allegations set forth above.

129.    Bezio and Legacy Global are parties to the LP Agreement.

130.    Pursuant to section 6.5 of the LP Agreement, Bezio as a Class C Unitholder was obligated to present to Legacy Global all investment or business opportunities of which he became aware and which would be within the scope and investment objectives related to the business of the Legacy Companies, beneficial to the business of the Legacy Companies, or would otherwise be competitive with the business of the Legacy Companies.

131.    By his conduct described above, including but not limited to by failing to present to Legacy Global the Rinks at Exeter expansion opportunity and instead by misappropriating for himself that opportunity, Bezio has breached the LP Agreement.

132.    As a result of his breach of the LP Agreement, Bezio has directly and proximately caused Legacy Global to suffer foreseeable and substantial damages within jurisdictional limits of this Court.

## COUNT TEN
(Good Faith and Fair Dealing – Bezio)

133.    Plaintiff restates and incorporates by reference herein the allegations set forth above.

134.    Bezio and Legacy Global are parties to the LP Agreement.

135.    Embodied within the LP Agreement is an implied and express covenant of good faith and fair dealing that Bezio will act in good faith and fairly with Legacy Global.

136.    By his conduct described above, including but not limited to by failing to present to Legacy Global the Rinks at Exeter expansion opportunity and instead by misappropriating for himself that opportunity, Bezio has breached the covenant of good faith and fair dealing embodied in the LP Agreement.

137.    As a result of his breach of the covenant of good faith and fair dealing, St. Pierre has directly and proximately caused Legacy Global to suffer foreseeable and substantial damages within jurisdictional limits of this Court.

## COUNT ELEVEN
(Conspiracy  St. Pierre, Bezio and Rinks at Exeter)

138.    Plaintiff restates and incorporates by reference herein the allegations set forth above.

139.     St. Pierre, Bezio, and Rinks at Exeter knowingly and intentionally combined, agreed, and conspired with one another, with Seacoast Spartans and others to unlawfully compete with Legacy Global, waste Legacy Global's resources for their own benefit, and usurp corporate opportunities belonging to Legacy Global, including, among other things, through conduct that constitutes a breach of St. Pierre's and Bezio's fiduciary duties and duties of loyalty, and interference with contractual obligations owed to Legacy Global.

140.    St. Pierre, Bezio, and Rinks at Exeter engaged in overt acts in furtherance of the conspiracy by, among other things, launching academy programs at Rinks at Exeter, pursuing international programs and the expansion opportunity of a dormitory that should have been presented to and pursued at Legacy Global, by using and wasting Legacy Global goodwill and resources in doing so, and by diverting significant time and efforts of St. Pierre and Bezio to their competitive activities that should have been devoted to Legacy Global matters.

141.    St. Pierre, Bezio, and Rinks at Exeter acted knowingly, willfully, intentionally, in bad faith, and with a reckless disregard for the contractual obligations and fiduciary duties owed by St. Pierre and Bezio to Legacy Global, with a purpose of unlawfully competing with Legacy Global and usurping corporate opportunities belonging to Legacy Global for the benefit of the Defendants.

142.    At times, each of St. Pierre and Bezio also participated in the conspiracy based on their personal stake in the outcome of it and to divert value to each of them directly and personally.

143.    By working together in the manner alleged herein, St. Pierre, Bezio and Rinks at Exeter were able to cause harm to Legacy Global a manner that they would not have been able to do had they not acted in combination with one another.

144.    The scheme alleged herein directly and proximately caused Legacy Global to suffer damages within jurisdictional limits of this Court in an amount to be proven at trial, including but not limited to the compensation that St. Pierre and Bezio caused Legacy Global to pay to St. Pierre, Bezio and other Legacy Global employees for services performed for the benefit of Rinks at Exeter.

## COUNT TWELVE
(Constructive Trust – Rinks at Exeter)

145.     Plaintiff restates and incorporates by reference herein the allegations set forth above.

146.     St. Pierre and Bezio knowingly, intentionally and willfully diverted corporate opportunities from Legacy Global to Defendant Rinks at Exeter, including the academy programs described above.

147.     Based on the totality of circumstances, this Court should impose a constructive trust on St. Pierre, Bezio, and the Rinks at Exeter, requiring them to hold their academy businesses and the fruits of their other wrongful acts for the benefit of Legacy Global.

## COUNT THIRTEEN
(Preliminary and Permanent Injunctive Relief – St. Pierre and Bezio)

148.     Plaintiff restates and incorporates by reference herein the allegations set forth above.

149.     The St. Pierre and Bezio Grant Agreements constitute binding and enforceable contracts between the parties.

150.     In paragraph 9 of their respective Grant Agreements, St. Pierre and Bezio agreed that during their employment with any of the Legacy Companies and for two (2) years after the termination of each of their employment, regardless of the reason for the termination, that neither St. Pierre nor Bezio would engage in certain Competitive Activity as defined in their respective Grant Agreements.

151.     Legacy Global has performed all of its obligations under the respective Grant Agreements.

152.    All conditions precedent to St. Pierre's and Bezio's performance of their obligations under their respective Grant Agreements have been satisfied or excused.

153.    By engaging in the conduct described above, during their employment at Legacy Global and within two years after the termination of St. Pierre's employment, including by pursuing competitive business activities as owners and interest holders of Rinks at Exeter, St. Pierre and Bezio have breached the Grant Agreement.

154.    St. Pierre, Bezio, and Legacy Global have agreed that irreparable harm to Legacy Global will arise in the absence of injunctive relief in the circumstances such as those that have arisen. Since the filing of this action, St. Pierre and the Rinks at Exeter agreed not to proceed with further plans for the dormitory and academy projects during the pendency of this action, but otherwise have not agreed to injunctive relief.

155.    As a result of St. Pierre's and Bezio's breaches of their respective Grant Agreements, Legacy Global is entitled to injunctive relief, preliminarily and permanently prohibiting St. Pierre, Bezio, and their agents from engaging in any further Competitive Activity for two (2) years, excluding the period of time in which either of St. Pierre or Bezio has engaged in improper competitive activities.

**COUNT FOURTEEN**
(Return of Company Property – St. Pierre and Bezio)

156.    Plaintiff restates and incorporates by reference herein the allegations set forth above.

157.    The St. Pierre and Bezio Grant Agreements constitutes binding and enforceable contracts between the parties.

158.    Pursuant to paragraph 7 of each of the respective Grant Agreements, St. Pierre and Bezio agreed, among other things, not to take or use for his personal benefit any of the Legacy Confidential Information.

159.    In paragraph 7(c) of their respective Grant Agreements, St. Pierre and Bezio agreed that upon the termination of his employment with the Legacy Companies for any reason or no reason, each of them would promptly return to the Legacy Companies all tangible items, including computer files, electronic media and data, containing, based upon or relating in any way to the Legacy Confidential Information, and any other items in St. Pierre's or Bezio's possession that are the property of the Legacy Companies.

160.    Legacy Global has performed all of their obligations under their respective Grant Agreements.

161.    All conditions precedent to St. Pierre's and Bezio's performance of their respective obligations under their respective Grant Agreements have been satisfied or excused.

162.    By engaging in the conduct described above, including but not limited to forwarding to himself emails containing Legacy Confidential Information, St. Pierre and Bezio have breached their respective Grant Agreements.

163.    As a result of St. Pierre's and Bezio's breach of their respective Grant Agreements, Legacy Global is entitled to injunctive relief, requiring St. Pierre and Bezio to return all Legacy Confidential Information and any other property of the Legacy Companies in his possession.

### COUNT FIFTEEN
(Tortious Interference – Rinks at Exeter)

164.    Plaintiff restates and incorporates by reference herein the allegations set forth above.

165.    St. Pierre and Legacy are parties to the St. Pierre Grant Agreement and the LPA.

166.    Rinks at Exeter, through its authorized agents, had knowledge of the contractual relationships between Legacy Global and St. Pierre.

167.    Rinks at Exeter intentionally and wrongfully interfered with Legacy Global's contractual relationship with St. Pierre with improper motives and/or by improper means, including, as set forth above, with the intention of usurping corporate opportunities belonging to Legacy Global, unauthorized use of employees, goodwill, intellectual property and other resources of Legacy Global, aiding and abetting breaches of fiduciary duty of Legacy Global's executives, and though Bezio's intentional, tortious and bad faith acts that included the wrongful exploitation and waste of Legacy's resources and the destruction of evidence.

168.    Rinks at Exeter's tortious interference directly and proximately caused Legacy Global to suffer damages within jurisdictional limits of this Court in an amount to be proven at trial, including but not limited to the profits enjoyed and/or projected by Rinks at Exeter.

**COUNT SIXTEEN**
(Tortious Interference – Rinks at Exeter)

169.    Plaintiff restates and incorporates by reference herein the allegations set forth above.

170.    Bezio and Legacy are parties to the Bezio Grant Agreement and the LPA.

171.    Rinks at Exeter, through its authorized agents, had knowledge of the contractual relationships between Legacy Global and Bezio.

172.    Rinks at Exeter intentionally and wrongfully interfered with Legacy Global's contractual relationships with Bezio, with improper motives and/or by improper means, including, as set forth above, with the intention of usurping corporate opportunities belonging to Legacy Global, unauthorized use of employees, goodwill, intellectual property and other

resources of Legacy Global, aiding and abetting breaches of fiduciary duty of Legacy Global's executives, and the wrongful exploitation and waste of Legacy's resources and the destruction of evidence.

173.    Rinks at Exeter's tortious interference directly and proximately caused Legacy Global to suffer damages within jurisdictional limits of this Court in an amount to be proven at trial, including but not limited to the profits enjoyed and/or projected by Rinks at Exeter.

## PRAYER FOR RELIEF

**WHEREFORE**, Legacy Global Sports, L.P. prays for the following relief:

(i)    On Counts One through Eleven, Fifteen and Sixteen, awarding money damages in Legacy Global's favor in the full amount of the injuries and damages it has suffered, as determined at trial together with prejudgment and post-judgment interest on all damages;

(ii)    On Counts Twelve through Fourteen, awarding the equitable relief sought, including a constructive trust, preliminary and permanent injunctive relief against competitive activity, and injunctive relief requiring the return to Legacy Global of property belonging to it, along with an award of attorneys' fees and costs; and

(iii)   Awarding Legacy Global such other relief as is just and reasonable under the

circumstances.

Respectfully submitted,

**LEGACY GLOBAL SPORTS, L.P.,**

By its attorneys,

/s/ Phillip Rakhunov
Phillip Rakhunov (#17153)
Barry S. Pollack (admitted *pro hac vice*)
POLLACK SOLOMON DUFFY LLP
101 Huntington Ave., Ste. 530
Boston MA 02199
Tel:(617) 439-9800
Email: prakhunov@psdfirm.com
            bpollack@psdfirm.com

Dated: December 18, 2019                   *Counsel for the Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document is being served upon counsel of record herein on December 18, 2019 via electronic filing.

/s/Phillip Rakhunov
Phillip Rakhunov